### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

FINANCIAL CASUALTY & SURETY        Civil No. 15-6644(NLH)
CO INC.,

          Appellant,        **OPINION**

    v.

STEPHEN C. THAYER,

          Appellee.

---

**APPEARANCES**:

SAMUEL M. SILVER
2050 ROUTE 27
SUITE 106
BRUNSWICK PLAZA
NORTH BRUNSWICK, NJ 08902
    On behalf of appellant

STEPHEN C. THAYER
1074 BUCKINGHAM DR.
WEST DEPTFORD, NJ 08086
    Appellee appearing *pro se*

**HILLMAN**, District Judge

    Presently before the Court is the appeal by Financial Casualty & Surety Company, Inc. (FCS) of the bankruptcy court's August 24, 2015 Opinion and Order granting summary judgment in favor of the debtor, Stephen C. Thayer.  FCS's adversary complaint contested the dischargeability of a judgment it obtained against Thayer arising from bail bond forfeitures.  For the reasons expressed below, the bankruptcy court's decision will be reversed and remanded for further proceedings consistent with this Opinion.

## BACKGROUND

### A.   Jurisdiction and Standard

This Court has jurisdiction over the appeal from the bankruptcy court's August 24, 2015 Opinion and Order pursuant to 28 U.S.C. § 158(a), which provides in relevant part: "The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders and decrees  . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.  An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."

In reviewing a determination of the bankruptcy court, the district court assesses the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse. In re Trans World Airlines, Inc., 145 F.3d 124, 131 (3d Cir. 1998).

### B.   Procedural History

In 2011, FCS filed an amended complaint that added Thayer and other bail bond agents to a civil action in this district.  (Civil Action No. 1:11-04316.)  FCS sought to recover from Thayer and other commercial bail bond agents unpaid premium, expenses, and for bail bond forfeiture liability.  FCS served Thayer with a summons and copy of FCS's complaint on February 13, 2012.

2

Because Thayer did answer or otherwise appear in the suit, in May 2012, the district court clerk entered a default against Thayer. On January 11, 2013, the district court executed a Final Default Judgment against Thayer for $192,985.41 ($17,698.30 in unpaid premium bail bond powers entrusted to Nicole Thayer, Stephen C. Thayer, and Shamrock Bail Bonds Limited Liability Company; $165,500.00 in bond forfeiture judgments; $3,172.70 in costs and fees associated with bond judgments; and $6,614.41 in reasonable and necessary attorney's fees and expenses).

On May 4, 2013, Thayer filed for protection under Chapter 7 of the Bankruptcy Code.  In his Petition, Thayer identified 18 creditors, including those holding secured and unsecured claims, along with their respective claims against Thayer's bankruptcy estate.  Thayer failed to list FCS as a creditor.  When Thayer filed an Amendment to his Schedules on May 22, 2013 and identified additional unsecured creditors, Thayer did not identify FCS as a judgment creditor.

In August 2013, BGM Financial, LLC ("BGM") (an unsecured creditor identified in Thayer's Schedule F) successfully challenged the dischargeability of its claims for fraud and breach of fiduciary duty against Thayer.  BGM sought to recover money damages from Thayer based on Thayer's role as BGM's sub-producer. BGM served as FCS's general agent for issuing bail bonds, and, in turn, Thayer served as FCS's sub-agent.

3

On August 23, 2013, the bankruptcy court closed Thayer's bankruptcy.  In April 2014, Thayer moved to re-open his bankruptcy to amend Schedules A and C with the intent to discharge FCS's judicial lien.  The bankruptcy court granted Thayer's request to re-open the proceedings and invited FCS to file an Adversary Complaint.  On June 24, 2014, FCS filed its Adversary Complaint in which it alleged that $165,000.00 of its total claim and attributable to bail bond forfeitures was nondischargeable pursuant to § 523(a)(7) as a debt "for fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty."  FCS also alleged $11,299.30 of unremitted premium for reported bail bond powers, and $6,399.00 in premium for unreported bail bond powers of attorney, were nondischargeable pursuant to § 523(a)(4) because the debt was based on "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  FCS later argued § 523(a)(4) as an additional ground to deny discharge of the forfeiture debt as well.  Thayer timely filed an answer.

FCS sought summary judgment to avoid discharge of the bail bond forfeitures and unpaid bail bond premium Thayer owed FCS. After a hearing and the filing of supplemental memoranda, the bankruptcy court denied FCS's Motion for Summary Judgment, granted summary judgment in favor of Thayer, and discharged Thayer's debt

to FCS.  FCS filed the instant appeal.

### C.  Background Facts

This Court restates the background facts from the bankruptcy court's Opinion, as most of these facts are not in dispute on appeal.[1]  (See Docket No. 3-5 at 3-8, internal citations omitted.)

As noted above, FCS's claims stem from a pre-petition judgment obtained by default against Debtors in the United States District Court for the District of New Jersey in the amount of $192,985.414 (the "Judgment").  The judgment arose from breach of a sub-producer bail bond agreement (the "Contract").  The parties to the contract were:

- FCS as "Company";
- James V. Mascola, Genevieve A. Steward and Bail Group Management, LLC as General Agent (collectively, "BGM");
- Mr. Thayer and/or Shamrock Bail Bonds as Sub-Producer; and
- Mrs. Thayer as Sub-Producer Indemnitor.

The Contract, dated June 7, 2008, provided that the General Agent would supply bail bond powers of attorney to the Debtor.  FCS acted as surety.  The Contract further provided that the Debtor "occupies a fiduciary relationship with Company and General Agent in relation to the conduct of its business."  As is the nature of the business, the Contract contemplated the possibility of bail bond forfeitures.  Bail bonds are forfeited when a defendant, for whose benefit the bond is issued, fails to appear for a court date.  Regarding bail bond forfeitures, the Contract

---

[1] Where relevant, disputed facts will be noted.

provided that the Debtor:

> shall be solely responsible for satisfying bail bond
> forfeitures; for investigation of bail bond principals and
> prospective bail bond principals; for negotiation,
> settlement, and/or satisfaction of claims against Company
> and/or General Agent/Sub-Producer by bail bond principals,
> courts, and/or others; and/or for any and all other matters
> of bail bond administration hereunder. Sub-Producer will make
> or cause to be made any and all necessary and warranted legal
> motions to preserve, reinstate, and exonerate bonds at Sub-
> Producer's sole expense.

Thus, after a forfeiture, the Debtor could mitigate a loss by ensuring that a defendant later appears or is delivered to the court.  If a defendant is not delivered, a bail bond judgment is entered.  The Debtor and FCS are equally obligated to pay the state for the bond forfeiture judgments.[2]  If the Debtor does not pay the debt, FCS must pay the debt if it wants to continue to do business in New Jersey.  Thereafter, its remedy is to seek indemnification from the Debtor.

As security for indemnification under paragraphs 17 and 18, the Contract provided for contribution by the Debtor to an indemnity fund.  The use of the indemnity fund was in FCS's discretion, and the balance of the fund would be returned to the Debtor upon termination of the Contract, subject to all other expenses being paid.  The indemnity fund could be used by FCS to

---

[2] Despite the Bankruptcy Court's characterization that this arrangement was undisputed, FCS disputes that it and Thayer are equally obligated to pay the state for the bond forfeiture judgments, relying upon the language in the parties' contract. This key issue to FCS's appeal is discussed in depth below.

reimburse itself (offset) for any forfeitures and unpaid

bail bond premiums.  FCS has invoked this right of setoff under

the Contract.  The parties sometimes refer to this indemnity fund

as a Build-Up Fund, or BUF.  The Debtor submitted a document

titled "Trust Account Details" for Thayer/Shamrock Bail Bonds.

This document reflects a continued build-up of the Debtor's BUF

account with FCS during the tenure of the parties' relationship.

The Contract had a specific provision regarding bail bond

forfeitures, as follows:

> As a courtesy, Company and/or General Agent shall make an
> effort to notify Sub-Producer of receipt of any bail bond
> forfeitures, whether threatened or declared, that Company
> receives from the Courts in relation to Sub-Producer's
> forfeitures. However, in all instances it shall be Sub-
> Producer's sole responsibility and duty to monitor properly
> the status and forfeitures of all bonds posted with bail bond
> Powers of Attorney entrusted to Sub-Producer by Company
> and/or General Agent . . . Sub-Producer shall take any and
> all necessary and lawful steps to terminate forfeiture
> liability within the applicable statutory time frame. When or
> if it is deemed necessary that such forfeiture or resulting
> judgment be paid, then, in addition to any other rights and
> remedies it may have under this Agreement, at law and/or
> equity, Company shall have the right to do any one or more of
> the following:
>
> > (a) Direct any party hereto indemnifying Company from
> > forfeiture to pay any part or all thereof;
> > (b) Pay part or all of the forfeiture judgment from the
> > indemnity Fund(s);
> > (c) Pay and/or direct payment of part of all of the
> > forfeiture judgment from any forfeiture collateral held
> > for such bond;
> > (d) Direct the bond principal and/or anyone
> > guaranteeing, assuring, or indemnifying Company and/or
> > any other party hereto against loss by reason of the
> > bond principal's noncompliance to pay part or all of the
> > forfeiture judgment; and/or
> > (e) Company may pay part or all of the forfeiture

7

judgment and reimburse itself in accordance with (a), (b), (c) and/or (d) of paragraph 20. All such rights of Company to reimbursement shall be primary to any such rights of any other party hereto, any holder of interest in and to collateral described in (c), and/or anyone described in (d).

Paragraph 20, referenced in paragraph 24(e), essentially repeats subparagraphs (a)-(c), and in addition provides in 20(d) that the Company retains discretion to direct the Debtor to defend and protect, or to refrain from defending, the Company and/or General Agent in any legal action.

**The Forfeiture Debt**

As to the Forfeiture Debt, FCS alleges that the Debtor wrote seventeen FCS bail bonds which were ultimately forfeited, resulting in judgments in the total amount of $165,500. FCS alleges that the Debtor failed to mitigate the forfeited bond judgments, either by locating the defendants and surrendering them to the New Jersey courts, or otherwise negotiating the bond obligations. FCS stated that as a result of the forfeited bail bonds the Superior Court of New Jersey precluded FCS from writing bail bonds in New Jersey. To regain its right to do business in New Jersey, FCS was obligated to pay the bond forfeiture liability. Thereafter, FCS withdrew $15,500 from the BUF account to offset the $165,500 liability. In support of the Forfeiture Debt, FCS submitted documentation concerning only one defendant bonded by the Debtor, Weston Smith. FCS supplied no documentation for the remaining sixteen bail bond forfeitures and in fact, has

8

waived its claim of nondischargeability for these sixteen claims. Consequently, FCS's demands for recovery on the remaining sixteen bail bond forfeitures are denied.

As to the Weston Smith bond, in the amount of $150,000, there can be no dispute it was forfeited and FCS initially satisfied the judgment in full.  FCS has submitted sufficient evidence to establish this fact.  In support of its claim, FCS avers that the Debtor consciously disregarded his duties regarding the Weston Smith forfeiture by failing to properly monitor the case and mitigate the loss.  It is interesting to note that the Notice of Bail Forfeiture for Surety dated June 16, 2011 in the amount of $150,000, on its face reveals that it was sent to FCS at its office in Texas and not to the Debtor.[3]  The Debtor points this fact out during his deposition and points out that "I know it's my responsibility, however if I don't know the bond forfeited, how am I supposed to produce a defendant if I don't have a valid forfeiture notice or arrest warrant?"  The Contract provides that FCS, as a courtesy, shall make an effort to notify the Debtor of receipt of any bail bond forfeitures.  The Debtor testified that he never received notice from FCS and that he had an incentive to recover Weston Smith through a $50,000 return to him personally.  Finally, the Debtor testified that FCS's failure to notify him hampered his ability to mitigate FCS's damages and

---

[3] This fact is disputed by FCS.

his history reflects that, except for Weston Smith, he captured all defendants on behalf of FCS.

The Debtor's testimony reflects a pattern of recovering forfeitures, and he provided documents to support his position that allegations made by FCS concerning the forfeitures are incorrect.  As to the Weston Smith forfeiture, the Debtor testified that once FCS took him of the bail registry, he could not recapture the defendant because it would be illegal.  More importantly, the Debtor did not know Weston Smith missed his court appearance, had no ability to confirm a court date other than through the defendant's own word, and during the three year period between the issuance of the bond and the forfeiture, took steps to mitigate damages and was monitoring the defendant through GPS and eventually phone calls and personal visits.  The Debtor also testified that he was told by Michael Padilla of FCS that his contract was cancelled and he could no longer post any bonds around the same time of the Weston Smith forfeiture.

**The Premium Debt**

Under the Contract the Debtor was to remit premiums or ensure remittance for each bail bond power of attorney issued.  The Debtor failed to remit some premiums to FCS.  In addition, once FCS terminated the Contract, the Debtor was to return all unused bail bond powers to FCS and remit premiums based on the amount of those bonds.  The Debtor failed to deliver any unused bail bond

powers and remit premiums to FCS in the amount of $6,399.00.  The
Debtor's failure to comply with the Contract resulted in the
Judgment (by default), a portion of which included the Premium
Debt.

For his part, the Debtor admits that he was required to
collect premiums.  The Debtor admits to owing premiums in the
approximate amount of $11,000.00 to FCS because he cannot prove
that he paid the premiums.  He also stated that at the end of the
Contract, he stopped paying premiums because the Contract
terminated and he was using the funds to pay forfeitures and
business expenses - in effect, playing "catch up".  The Debtor
testified that he believed that there was sufficient funds
contained in the BUF account to satisfy any outstanding premiums
and that the premiums would be paid from the BUF account.  As of
December 30, 2011, there was $40,566.86 in the BUF account.  FCS
did not offset the BUF account to pay the Premium Debt.  Finally,
the Debtor consistently testified that he believed he returned the
unused bond powers to BGM.[4]

## DISCUSSION

### A.   Whether a debt arising from a bail bond forfeiture judgment is dischargeable under 11 U.S.C. § 523(a)(7)

The primary issue presented by this bankruptcy appeal is
whether a bail bond forfeiture judgment jointly entered against a

---

[4] FCS contests that Thayer returned all unused powers of attorney.

bail bondsman, who signed the bond, and the surety, which
underwrote the bond, is dischargeable debt in the bondsman's
bankruptcy under 11 U.S.C. § 523(a)(7)[5] when the surety has paid
the judgment to the state and subsequently obtained a default
judgment against the bondsman in the amount of the bail bond
forfeiture judgment.

This precise issue has not been answered by any court in the
Third Circuit.[6] The Third Circuit has, however, determined that an

---

[5] 11 U.S.C. § 523(a)(7) provides, "(a) A discharge under section
727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not
discharge an individual debtor from any debt--  . . .(7) to the
extent such debt is for a fine, penalty, or forfeiture payable to
and for the benefit of a governmental unit, and is not
compensation for actual pecuniary loss, other than a tax penalty .
. . ."

[6] The bankruptcy court addressed whether Fifth Circuit law would
apply to the issue because the contract between FCS and Thayer
contains a choice of law provision that references the application
of Texas law.  The Court finds that only Third Circuit law and New
Jersey state law apply to this issue, and a discussion of Fifth
Circuit law is unnecessary, for several reasons.  First, the
choice of law provision in the contract provides that the
agreement is to be interpreted under the law of Texas, FCS's state
of incorporation, or the law of the Thayer's home state, which is
New Jersey.  The choice of which law to apply is at FCS's
discretion. (Docket No. 3-3 at 21.)  As discussed herein, even if
the Fifth Circuit's analysis of the dischargeability of a bail
bond forfeiture judgment under 11 U.S.C. § 523(a)(7) could be
considered "Texas law," it is evident that FCS does not wish that
law to apply in this context.  Second, whether Thayer's debt is
dischargeable under 11 U.S.C. § 523(a)(7) requires the
interpretation of federal bankruptcy law, and not the
interpretation of the contract, which would implicate the choice
of law provision.  See In re Gonzalez, No. BR 15-10628 ELF, ---
B.R. ---, 2016 WL 2944281, at *3 (Bankr. E.D. Pa. May 19, 2016)
(citing Butner v. United States, 440 U.S. 48, 54-55 (1979); In re
Brannon, 476 F.3d 170, 176 (3d Cir. 2007); United States v. Energy
Res. Co., 495 U.S. 545, 549 (1990)) ("When a debtor enters the

unsatisfied bail bond forfeiture judgment entered against a commercial bail bondsman cannot be discharged in bankruptcy under 11 U.S.C. § 523(a)(7).  In Dobrek v. Phelan, 419 F.3d 259, 262 (3d Cir. 2005), the plaintiff filed suit against the Clerk of the New Jersey Superior Court, claiming that he was wrongfully removed from the bail registry because his bail bond debts were discharged in bankruptcy pursuant to 11 U.S.C. § 727.  The district court dismissed plaintiff's claims, finding that bail bond forfeiture judgments are not dischargeable debt under 11 U.S.C. § 523(a)(7).  On appeal, the Third Circuit affirmed.

In its decision, the Third Circuit first briefly explained the bail bond system in New Jersey:

> New Jersey courts permit individuals and companies to
> post bail bonds for criminal defendants in return for a fee.
> Once the bondsman posts bail for an accused, it becomes the

---

bankruptcy system, state or non-bankruptcy federal law usually determines the scope and nature of a debtor's property interests and the debts subject to adjustment.  The next part of the bankruptcy process involves the application of federal bankruptcy law to those pre-existing relationships, i.e., the extent to which the provisions of the Bankruptcy Code permit the Debtor to modify those preexisting relationships.").  Third, the debt that Thayer seeks to discharge arises from a New Jersey district court default judgment entered because of Thayer's New Jersey state bail bond recognizance agreement and resulting New Jersey state bail bond forfeiture judgment.  Finally, the binding federal bankruptcy law to be applied here is that of the Third Circuit, which has expressly rejected the Fifth Circuit's position on this issue. See Dobrek v. Phelan, 419 F.3d 259, 267 (3d Cir. 2005) (disagreeing with In re Hickman, 260 F.3d 400, 405 (5th Cir. 2001), which held that commercial bondsman's bail forfeiture debts are dischargeable in bankruptcy).

bondsman's responsibility to produce the defendant for
required court proceedings.  If the defendant fails to
appear, then the bail posted is "forfeited," and the bondsman
becomes responsible for the amount of bail or for ensuring
that the fugitive defendant is captured and brought to court.
The bondsman's obligation to satisfy bail in this
circumstance may be underwritten by insurance companies
licensed to do business in New Jersey. . . .

Dobrek was, at different times, an authorized agent of
various commercial surety companies.  In connection with this
work, Dobrek was listed on the New Jersey Bail Registry
("Bail Registry"), a list of insurance producers and limited
insurance representatives licensed to write bail bonds in New
Jersey.  Individuals who are not listed on the Bail Registry
cannot engage in the business of writing bonds in that state.
As an agent who executed bail bonds on behalf of surety
companies, Dobrek, like all other such agents in New Jersey,
was responsible for the contractual default of these
companies in the event that a defendant failed to appear in
court, at least to the extent of being precluded from writing
additional bonds until the bail forfeiture judgments were
satisfied.  In other words, in instances where defendants
failed to appear, judgment was entered against both the
commercial sureties and Dobrek, as the signer of the bail
bond.  As a result, Dobrek was jointly bound to pay to the
court any amount of money specified in a court order setting
bail where a defendant failed to appear at any required court
proceedings.

Dobrek, 419 F.3d at 261 (citing Capital Bonding Corp. v. N.J.

Supreme Court, 127 F. Supp. 2d 582, 584 (D.N.J. 2001); In re

Preclusion of Brice, 366 N.J. Super. 519, 841 A.2d 927, 929 (App.

Div. 2004)).

The Third Circuit then discussed In re Gi Nam, 273 F.3d 281

(3d Cir. 2001), where it considered the related issue of whether

the bail bond debts of an individual family member acting as a

surety are excepted from discharge under § 523(a)(7).  Relying on

the plain meaning of the statute, the purpose and context of

Pennsylvania's bail forfeiture laws, and public policy considerations, the Third Circuit determined in Gi Nam that such bail bond debts are nondischargeable. Dobrek, 419 F.3d at 260 (3d Cir. 2005). The Dobrek court extended the reasoning in Gi Nam to bail bond forfeiture judgments entered against commercial bail bondsmen in New Jersey.

In addition to following the plain language of § 523(a)(7), the Third Circuit in Dobrek reviewed New Jersey's statutory treatment of bail bond judgments, which suggested that these debts were considered "forfeitures" under state law, and that the state law context of Dobrek's debts reinforced the conclusion that they were "forfeitures" within the meaning of § 523(a)(7). Id. at 266 (citing N.J. Ct. R. 3:26-6; Gi Nam, 273 F.3d at 288 ("Indeed, "'[a]lthough the label that state law affixes to a certain type of debt cannot of itself be determinative of the debt's character for purposes of the federal dischargeability provisions, such state-law designations are at least helpful to courts in determining the generic nature of such debts....'"")).

The Third Circuit noted that it had previously limited its holding in Gi Nam to a family surety, but it extended the holding of Gi Nam to the commercial context. Id. at 265 ("[I]n spite of our earlier disavowal of the applicability of Gi Nam's reasoning to commercial bondsmen, upon further reflection, we conclude that many of the policy concerns of Gi Nam apply with equal force to

15

commercial bondsmen.").  It presented two policy reasons for why bail bond forfeiture judgments should not be dischargeable in bankruptcy:

(1) "[A]llowing commercial bondsmen to discharge bail bond debts in bankruptcy could encourage the use of federal bankruptcy laws to evade the financial consequences of noncompliance with a bail bond agreement.  Indeed, while bail forfeitures are an anticipated cost of doing business, a bail bondsman would certainly prefer to avoid these debts.  Should a commercial bondsman be allowed to discharge these debts in bankruptcy, bankruptcy could become an attractive option over satisfying one's financial obligations to the state"; and

(2) "[S]hould the bail bond debts of a commercial bondsman be dischargeable in bankruptcy, the state's criminal proceedings may effectively be invalidated, triggering comity and federalism concerns.  The non-appearing or fugitive defendant would be out of the state's custody and the professional bondsman would no longer have any incentive to produce him in court."  Dobrek, 419 F.3d at 265 (internal citations omitted).

The Third Circuit succinctly concluded, "Because we read the text of § 523(a)(7) to encompass the type of bail bond debts at issue here, and because we are persuaded by the reasoning in Gi Nam, we hold that § 523(a)(7) excepts from discharge bail bond forfeitures entered against a commercial bail bondsman."  Id. at

16

267.

In its decision allowing Thayer to discharge his debts
arising from the bail bond forfeiture judgment, the bankruptcy
court did not find Dobrek controlling.  The bankruptcy court
discussed Fifth Circuit law, the Third Circuit Gi Nam case, and
cases from the Southern District of New York, upon which it relied
heavily.  The bankruptcy court acknowledged that Dobrek held that
§ 523(a)(7) excepts from discharge bail bond forfeitures entered
against a commercial bail bondsman, but it appears to have
distinguished Dobrek from the instant matter because the bail bond
forfeiture judgment remained unsatisfied in Dobrek.  In other
words, whereas the bail bond forfeiture judgment in Dobrek was
unpaid by the parties against whom the judgment was entered – the
criminal defendant, the bail bondsman, and the surety – in this
case the bail bond forfeiture judgment, which was also entered
against the criminal defendant, the bail bondsman, and the surety,
was paid by the surety.[7]  Because of this difference, the

---

[7] Dobrek's arrangement with several sureties was essentially
identical to Thayer's arrangement with FCS.  (See Civil Action 04-
313 JBS-JBR, Docket No. 7-1 at 6.)  It appears that several bail
bond forfeiture judgments were entered against Dobrek and
different sureties.  One of those sureties was removed from the
bail bond registry, but two others were not.  It is not clear from
the record whether the two sureties that were not removed from the
bail bond registry paid the forfeiture judgments so that they
could continue underwriting bonds in New Jersey.  If they did, and
if Dobrek sought to have those surety-satisfied forfeiture
judgments discharged in bankruptcy, the holding of the Third
Circuit in Dobrek's case would be directly on-point with this
case.

bankruptcy court focused on whether "private corporations such as FCS, which are engaged in the business of insuring bail bonds and other suretyship obligations for profit, can step into the shoes of a governmental entity to recovery on an otherwise contractual liability for damages to that private corporation as if it were a forfeiture to a governmental entity." (Docket No. 3-5 at 10.)

In determining that FCS could not "step into the shoes" of the state, by way of equitable subrogation, and meet the requirement that the forfeiture judgment was "payable to and for the benefit of a governmental unit," the bankruptcy court ostensibly determined that the dispositive difference between Dobrek and this case is that FCS is clearly not a governmental unit, and Thayer's debt to FCS arose by way of a contractual indemnification provision.  That is, even though Thayer and FCS were both liable for the forfeiture judgment to the state, because FCS paid the debt to the state, Thayer, by filing bankruptcy, is now absolved from all liability for that debt.

We are unpersuaded that the timing difference identified by the bankruptcy court renders Dobrek inapplicable in this matter. To the contrary, we find it controlling.  The purpose of the bail bond system, along with the public policy considerations expressed in Dobrek, all demand that the dischargeability of a bail bond forfeiture judgment against a bail bondsman cannot hinge on whether or not a surety, which underwrites all commercial bonds to

18

the state, pays the forfeiture judgment.

The right to bail is guaranteed by the New Jersey Constitution.  "All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great," and "[e]xcessive bail shall not be required."  N.J. Const. art. I, ¶¶ 11, 12.  These provisions have been incorporated into N.J. Court Rules 3:26-1 and 7:4-1.[8]

The State of New Jersey, Commission of Investigation, recently issued a report on New Jersey's bail bond industry and noted,

> Bail is a central element of the criminal justice system. Enshrined as a constitutional right, it is intended to strike a balance between shielding criminal defendants from excessive pretrial detention while simultaneously holding them accountable to attend required court proceedings.  The accused may gain release by posting cash and/or property directly with the court or by paying a percentage of the total bail for a surety bond through a licensed commercial bail-bond agency.  Much is at stake in maintaining the integrity of a properly functioning bail process, including public safety, the credibility of law enforcement and judicial institutions and the appropriate administration of justice.

INSIDE OUT, Questionable and Abusive Practices in New Jersey's

---

[8] N.J. Const. art. I, ¶ 1, effective January 1, 2017, has been revised to state: "All persons shall, before conviction, be eligible for pretrial release.  Pretrial release may be denied to a person if the court finds that no amount of monetary bail, non-monetary conditions of pretrial release, or combination of monetary bail and non-monetary conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process."

<u>Bail-Bond industry</u>, State of New Jersey, Commission of
Investigation, May 2014, at 1.[9]

　　Because the State Commission of Investigation found the bail-
bond system in New Jersey to be "highly prone to subversion by
unscrupulous and improper practices that make a mockery of the
public trust," the Commission recommended "a series of statutory
and regulatory measures to provide stronger oversight of the bail
industry, particularly related to the licensure of bail agents and
agencies and the operation of those businesses."[10]  <u>Id.</u> at 1, 5.

　　The New Jersey courts have similarly recognized the critical
role bail bond sureties and their agents have in the bail bond
system.

　　　The purpose of bail is to secure the release of the accused
　　　from imprisonment pending disposition of the charge and to
　　　assure his presence in court when lawfully required in
　　　connection with that charge.  A recognizance of bail  . . .
　　　executed by a surety amounts to a contract between that
　　　surety and the State.  Under such a contract, when a criminal

---

[9] Available at http://www.nj.gov/sci/pdf/BailReportSmall.pdf.

[10] As a result of the New Jersey Commission of Investigation
report, the Supreme Court created a Bail Judge Subcommittee to
identify issues and concerns with the bail forfeiture recovery
process and the bail bond system.  The Subcommittee issued a
report in February 2016.  The Supreme Court invited written
comments from the Bar of New Jersey, which were due by June 9,
2017. <u>See</u> http://www.judiciary.state.nj.us/notices/2016/
n160510a.pdf.

The Court notes that by relating the serious issues with the bail
bond system in New Jersey, it does not intend to suggest that
Thayer was a participant in any of the unscrupulous activities
described by the New Jersey Commission of Investigation.  Indeed,
the bankruptcy court viewed Thayer to be credible, and this Court
has no reason to question that assessment.

defendant, as the principal under the bail bond, defaults on his obligation to appear in court when lawfully required, the surety is obligated to locate, apprehend and return the defendant to custody.  Therefore, if a surety seeks a partial or total remission of a forfeiture of bail, it bears a heavy burden to show that it has satisfied its essential obligation under the recognizance to secure the defendant's return to custody, and in the absence of this showing, the trial court may determine that the forfeiture should stand.

State v. Mercado, 747 A.2d 785, 789 (N.J. Super. Ct. App. Div. 2000) (internal citations omitted).

Because commercial sureties contract with agents and bail bondsmen to perform the actual duties of assuring the criminal defendant's obligation to appear in court when lawfully required, the agent and bail bondsman, as well as the criminal defendant, sign a bail recognizance agreement.  That agreement provides,

The insurer, bail agency and bail agent agree to be responsible for:

(a) Producing the defendant for all court proceedings, unless otherwise authorized by the court;

(b) Supervising the defendant while he or she is released on bail under the terms of this Recognizance;

(c) Taking immediate steps to recapture the defendant should the defendant fail to appear for any court appearance;

(d) Notifying the court immediately in writing of any change in the defendant's address;

(e) Notifying the court immediately in writing if the defendant is detained in jail or prison or otherwise cannot appear at a court proceeding.

    . . . Any notice of forfeiture will be served on the corporate surety (insurer), bail agency and bail agent at the address listed in the Bail Registry . . . .

New Jersey Bail Recognizance, available at

21

http://www.judiciary.state.nj.us/directive/criminal/dir_13_04.pdf.

In the event a criminal defendant fails to appear and the recognizance is breached, a forfeiture judgment is entered against the fugitive, the surety, and the bail agent/bondsman.  See In re Preclusion of Brice, 841 A.2d 927, 929-30 (N.J. Super. App. Div. 2004) (noting that a bail bond is a "written undertaking, by and between the State, defendant and surety, that the defendant will appear at any required court proceedings, comply with the conditions of bail, and that if the defendant fails to do so, the signers of the bond will pay to the court the amount of money specified in the court order setting bail," recognizing that "an agent may make himself individually responsible by engaging expressly to perform his principal's obligation," and finding that "in view of the bond conditions and the . . . instructions, that the agent's signature on the bond constitutes such an engagement").

Moreover, in addition to a bail bondsman's liability for a bail bond forfeiture judgment based on the recognizance agreement, a bail bondsman's agreement with the surety imparts liability as well.  For example, in In re Preclusion of Brice, the bondsman's agreement with the surety imposed "upon the agent/bondsman the duty to 'see to it the persons bonded appear in court when required,'" and provided "that if the agent/bondsman violates the agreement or 'any other obligation' he has undertaken and owes to

22

the principal, he is obliged to indemnify the principal for its losses resulting therefrom." <u>Id.</u> at 930.  "[E]ven more specifically, by paragraph 15, captioned 'Forfeitures' the agent/bondsman agrees that upon breach of any obligation imposed upon him by the agreement, he 'shall be financially responsible for the payment of any and all summary judgments of same.'"  <u>Id.</u> The court held, "We think it plain, therefore, that even if the form of recognizance bond, together with its conditions and instructions, did not impose individual liability on the agent, his own agreement with his principal did."  <u>Id.</u>

Public policy considerations also mandate that the bondsman must be personally liable for a non-appearing criminal defendant.

[T]he imposition of this obligation and the consequence of non-compliance on the agent accords with the demands of public policy.  It is the agent, not the surety, who determines which risks he will accept and those defendants for whom he will write bonds.  By writing the bond, he undertakes to assure the defendant's appearance, and the corollaries of that obligation are his duty to monitor and supervise the defendant after his release on bail and to recapture him should he fail to appear.  Were we to accept [the bail bondsman's] argument that no personal liability can attach despite his non-compliance with these duties, despite his individual undertaking to the court, and despite his unilateral decision to accept poor risks, there would be no penalty for his non-compliance and no incentive to his performance of his ultimate obligation of producing the defendant in court and recapturing him if he fails to appear. Those consequences are unacceptable if we are to maintain the integrity and function of the bail-bond system.

<u>In re Preclusion of Brice</u>, 841 A.2d at 930-31.

To summarize the foregoing, the bail bond system is a central element of the criminal justice system, and a properly functioning

23

bail process is imperative.  To maintain the integrity of the
system, both the surety and the bondsman are held financially
accountable[11] for a non-appearing criminal defendant.  With regard
to the bondsman, who performs the actual duties of producing,
supervising, and recapturing the criminal defendant, his liability
for any forfeiture judgment arises from both the bail recognizance
agreement with the state and his contract with the surety.
Without this personal liability, the bail bondsman would not face
any penalty for failing to assure the appearance of a criminal
defendant, and the public safety and administration of justice
would be threatened.

In this case, if FCS had not paid the bond forfeiture
judgment, Thayer would still be responsible to the state for the
judgment.  In that posture, just like in Dobrek, Thayer would not
be permitted to have his obligation for payment of the judgment to
the state discharged under § 523(a)(7).  The bankruptcy court
determined that because FCS paid that judgment, however, Thayer's
obligation is extinguished.  The discharge of Thayer's obligation
is equivalent to erasing the penalty for Thayer's failure to

---

[11] Unlike several other states, violations of the bail bond
regulations amounts only to administrative penalties.  The New
Jersey Commission of Investigation has recommended that the state
criminal code be amended to include criminal penalties against
bail bondsmen for certain violations.  INSIDE OUT, Questionable
and Abusive Practices in New Jersey's Bail-Bond industry, State of
New Jersey, Commission of Investigation, May 2014, at 60-61,
available at http://www.nj.gov/sci/pdf/BailReportSmall.pdf.

secure the fugitive criminal defendant's appearance that gave rise
to the forfeiture judgment.[12]  This result cannot stand in light of
all the considerations set forth above.

It is a constitutional right in New Jersey that "[a]ll
persons shall, before conviction, be bailable by sufficient
sureties."  N.J. Const. art. I, ¶¶ 11.  In order for FCS to
provide "sufficient sureties" in New Jersey, it was compelled to
pay the bail bond forfeiture judgment for which Thayer was liable
based on the recognizance agreement with the state and the
agreement between FCS and Thayer.[13]  If it did not pay the bail

---

[12] The bankruptcy court considered Thayer's testimony regarding the
circumstances of the non-appearing fugitive, Weston Smith.  The
bankruptcy court found that because Thayer had been vigilant in
capturing other defendants in the past, it was improbable that he
intentionally ignored the notice of forfeiture regarding Smith.
The bankruptcy court's factual determinations on this issue are
discussed in the next section of this Opinion concerning whether
the fees and costs associated with the forfeiture judgment that
Thayer contractually owed to FCS are dischargeable under 11 U.S.C.
§ 523(a)(4) "for fraud or defalcation while acting in a fiduciary
capacity."

[13] The agreement between FCS and Thayer provided, "[I]n all
instances it shall be Sub-Producer's sole responsibility and duty
to monitor properly the status and forfeitures of all bonds posted
with bail bond Powers of Attorney entrusted to Sub-Producer by
Company and/or General Agent, including all transfer bonds caused
to be posted by Company, either at Sub-Producer's request or at
General Agent's request for Sub-Producer, regardless of who posts
said bonds. Sub-Producer shall take any and all necessary and
lawful steps to terminate forfeiture liability within the
applicable statutory time frame."  (Docket No. 3-3 at 21.)

It also provided, "Sub-Producer shall be solely responsible for
negotiating, underwriting, securing, and posting bail bonds issued
to secure the release from custody of bail bond
principals/defendants. Sub-Producer shall be responsible for all

25

bond forfeiture judgment on Thayer's behalf, it would have been removed from the bail bond registry and not permitted to underwrite bail bonds in New Jersey. According to the bankruptcy court's decision, Thayer's obligation to pay the bail bond forfeiture judgment to the state would not be dischargeable in bankruptcy so long as FCS was removed from the bail bond registry due to an unpaid bond. Thayer's debt would be dischargeable, however, if FCS took action to remain on the bail bond registry by paying the bond. This presents a Hobson's choice for FCS and other sureties in a similar situation: pay the forfeiture judgment and continue its business in New Jersey even though it cannot recover the payment from the bail bondsman if he files bankruptcy, or do nothing and cease to do business in New Jersey so that the bail bondsman remains liable for the judgment even if he files bankruptcy. The doctrine of equitable subrogation is the cure for this Hobson's choice.

---

dealings with bail bond principals/defendants, including but not limited to their court appearances, apprehension, holding, movement, arrest, extradition, and/or  surrender (hereinafter "dealings with bond principals/defendants"). Sub-Producer's dealings with bail bond principals/defendants will be conducted in compliance with all applicable laws, statutes, regulations, and prudent business practices utilized in the bail bond business. Sub-Producer shall be solely responsible for any damages arising from or occasioned by dealings with bail bond principals/defendants.  . . .  Sub-Producer shall exercise extreme care in its dealings with bail bond principals/defendants, and shall exercise the utmost care and caution in the selection of persons assisting Sub-Producer in dealings with bail bond principals/defendants." (Docket No. 3-3 at 17.)

New Jersey courts widely recognize the doctrine of equitable subrogation, see In re Bridge, 18 F.3d 195, 201 (3d Cir. 1994), which is implicated "'when an obligation is discharged by one not primarily liable for it, but who believes himself to be acting either in the performance of a legal duty, or for the protection of a legal right, or at the request of the party ultimately bound, and even in certain other cases, favored by public policy, . . . the party thus discharging the obligation is entitled in equity to demand, for his reimbursement, . . . the performance of the original obligation, and the application thereto of all securities and collateral rights held by the creditor,'" Burke v. Izmirlian, No. A-3762-09T3, 2011 WL 1661022, at *3 (N.J. Super. Ct. App. Div. May 4, 2011) (quoting Schmid v. First Camden Nat. Bank & Trust Co., 130 N.J. Eq. 254, 255, 22 A.2d 246 (Ch. 1941)); see also Feigenbaum v. Guaracini, 952 A.2d 511, 519 (N.J. Super. App. Div. 2008) (citations omitted) ("Subrogation rights may be created in three different ways: (1) by agreement; (2) by statute; or (3) judicially as an equitable device to compel the ultimate discharge of an obligation by the one who should in good conscience pay it. The doctrine of equitable subrogation should not be imposed where its enforcement would be inconsistent with the terms of a contract or when the contract, either expressly or by implication, forbids its application. Equitable subrogation may only be imposed if the

27

cause is just and enforcement is consonant with right and justice.").

Thayer was obligated to the state of New Jersey to pay the forfeited bail bond.  FCS paid the debt on Thayer's behalf, only so it could continue to underwrite bail bonds in New Jersey. Based on the principles of the equitable subrogation doctrine, FCS is entitled to the same protections as the state would have if FCS did not pay the forfeiture judgment.  See Schmid, 130 N.J. Eq. 254 at 255 ("Where subrogation is claimed on the ground that the payment was necessary to protect the interests of the subrogee, the extent or quantity of interest which is in jeopardy is not material.  If he has any palpable interest, which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could.").

Applying the equitable subrogation doctrine under these circumstances also addresses the public policy concerns that would arise from a bondsman's ability to discharge in bankruptcy his liability for bail bond forfeiture judgments.  The discharge of bail bond forfeiture judgments, even ones that were paid by the surety and transformed into civil litigation default judgments, would (1) encourage the use of federal bankruptcy laws to evade the financial consequences of noncompliance with a bail bond agreement, (2) become an attractive option over the bondsman

28

satisfying his financial obligations to the state, (3) effectively invalidate the state's criminal proceedings, triggering comity and federalism concerns, and (4) cause the fugitive defendant to be out of the state's custody and the professional bondsman would no longer have any incentive to produce him in court.

In short, bail bond forfeiture judgments entered against a bail bondsman cannot, in any fashion, be discharged in bankruptcy. The Court will therefore reverse the bankruptcy court's determination of this issue.

**B.   Whether the premium debt is dischargeable under 11 U.S.C. § 523(a)(4)**

Section 523(a)(4) of the Federal Bankruptcy Code provides that an individual cannot obtain a bankruptcy discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  FCS argues that Thayer's obligation to pay the premiums owed[14] to FCS cannot be discharged in bankruptcy because Thayer breached his fiduciary duties to FCS by way of defalcation of those duties.[15]

---

[14] FCS also argues that Thayer breached his fiduciary duties by failing to return unused bail bond powers of attorney.  The unpaid premiums and the unreturned powers of attorney constitute the "premium debt" that FCS contends is exempt from discharge under § 523(a)(4).  The Court's analysis of the unpaid premiums also applies to the unreturned powers of attorney.

[15] In addition to its argument under § 523(a)(7), FCS argues that the forfeiture judgment also cannot be discharged under § 523(a)(4).  In determining that Thayer's actions concerning the forfeiture judgment did not fall under § 523(a)(4), the bankruptcy court accepted Thayer's testimony that he did not receive notice

29

The Supreme Court has described the parameters of what constitutes "defalcation."

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong.  We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.  Thus, we include reckless conduct of the kind set forth in the Model Penal Code.  Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.  That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." . . .

> [T]this interpretation does not make the word identical to its statutory neighbors.  As commonly used, "embezzlement" requires conversion, and "larceny" requires taking and carrying away another's property.  "Fraud" typically requires a false statement or omission.

---

that the criminal defendant, Weston Smith, failed to appear, or that a resulting forfeiture judgment had been entered.  The bankruptcy court noted that there was no evidence in the record that FCS informed Thayer about Weston's non-appearance or the forfeiture judgment.  Without this notice, the bankruptcy court concluded that Thayer could not have mitigated the situation, and therefore Thayer's actions did not constitute fraud or defalcation as to the forfeiture debt.  FCS argues that these findings do not consider that the failure-to-appear and forfeiture judgment notices were mailed to Thayer's address, and that Thayer was still a registered bail bondsman with the state at the time of the non-appearance and entry of forfeiture judgment who was obligated, both through his agreement with the state and FCS, to track criminal defendants or pay forfeitures.  Because the Court has found that Thayer cannot discharge the debt that resulted from a bail bond forfeiture judgment under § 523(a)(7), the Court does not need to determine whether the bankruptcy erred in determining that the forfeiture judgment did not meet the elements of nondischargeability under § 523(a)(4).

Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1759-60, 185 L.
Ed. 2d 922 (2013) (internal citations omitted).

In the bail bond business in New Jersey, the purchaser of a
bond – often a family member of a criminal defendant - usually
pays a premium of ten percent of the amount of the bond to the
bondsman.  Lexington Nat. Ins. Corp. v. Ranger Ins. Co., 326 F.3d
416, 417 (3d Cir. 2003).  The bondsman then divides the premium
with the insurance company.  Id. at 418.  The percentage of the
premium the bondsman retains varies, but typically a bondsman
remits 20% of the premium to the company for its share of the
premium, and 10% of the premium to the company for payment into a
reserve fund – "build-up fund" - to secure the company against
loss in the event of a forfeiture.[16]  Id.

With regard to the premium Thayer owed to FCS, the bankruptcy
court determined that because Thayer used the money to pay other
forfeitures and his business expenses, including legal fees, and
because Thayer believed that his build-up fund contained
sufficient funds to cover the costs of the outstanding premiums,
Thayer's failure to pay the premiums to FCS did not amount to

_____

[16] The parties' agreement in this case provides, "Unless otherwise
authorized and/or directed by Company, and without regard to
premium credit extended to customers, Sub-Producer shall remit to
Company and/or General Agent within 14 days of execution of each
bond hereunder such cash sums for premiums as will equal to 2.0 %
($20.00 per $1,000.00) of the total amount of Bond Liability for
each bond written by Sub-Producer. Company shall charge a minimum
of $10.00 per bond issued."  (Docket No. 3-3 at 26.)

31

fraud or defalcation.  The bankruptcy court referred to the parties' contract, which the bankruptcy court found to have "contemplated" such an occurrence.

In its appeal, FCS argues that Thayer's admission that he purposefully failed to pay FCS the premiums and instead used them to pay for other expenses demonstrates a breach of fiduciary duties to FCS that amounts to defalcation.  FCS argues that Thayer held the premiums in trust for FCS, and that Thayer admittedly knew that the premiums were not his to use.  FCS contends that regardless of the value of the build-up fund or how he used the money, Thayer intentionally and recklessly breached his fiduciary obligations to FCS by converting FCS's premium payments for his own use.

As a primary matter, it is clear that Thayer, as the agent for FCS, held a fiduciary duty to FCS.[17]

> The scope of the term "fiduciary" under § 523(a)(4) is a
> question of federal law.  Analysis of state law, however, is
> necessary to determine when the requisite trust relationship
> exists.  The traditional definition of "fiduciary," involving
> a relationship of confidence, trust and good faith, is too
> broad for the purposes of bankruptcy law.  Rather, the
> meaning of "fiduciary" for purposes of Bankruptcy Code
> section 523(a)(4) is limited to instances involving express
> or technical trusts.  Moreover, the trustee's duties must be
> independent of any contractual obligation between the parties
> and must be imposed prior to, rather than by virtue of, any
> claim of misappropriation.  Accordingly, implied or
> constructive trusts and trusts ex maleficio are not deemed to

---

[17] The bankruptcy court did not decide whether a fiduciary duty existed between FCS and Thayer because it found that Thayer's conduct and state of mind did not rise to the level of fraud or defalcation.

impose fiduciary relationships under the Bankruptcy Code. The reason for this narrow interpretation is to promote the Bankruptcy Code's "fresh start" policy.

There are different requirements that must be met to establish the existence of either an express or technical trust. To establish an express trust three elements must be met: (1) a declaration of trust; (2) a clearly defined trust res; and (3) an intent to create a trust relationship. The definition and scope of a technical trust, however, is difficult to determine.  Some courts have determined that technical trusts for purposes of § 523(a)(4) can be created by state statutes.  Other courts have found that state common law can create the requisite fiduciary relationship. Notwithstanding the differences in the means of establishing these two types of trusts, the scope of technical and express trusts is "not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."

In re Kaczynski, 188 B.R. 770, 773-74 (Bankr. D.N.J. 1995) (citing

Matter of Angelle, 610 F.2d 1335, 1339 (5th Cir. 1980)) (other

internal citations omitted); see also Matter of Tran, 151 F.3d

339, 342-43 (5th Cir. 1998).[18]

In this case, a fiduciary relationship and an express trust

existed between FCS and Thayer.  The contract between FCS and

Thayer provides:

---

[18] FCS cites to Texas law to support its position that Thayer acted in a fiduciary capacity to FCS.  As noted above, supra note 6, the agreement between FCS and Thayer contains a choice of law provision that allows FCS to choose either Texas or New Jersey law to apply.  Even though the Fifth Circuit case law does not support FCS's position with regard to the dischargeability of bail bond forfeiture judgments under § 523(a)(7), FCS relies upon Texas state court cases to support its non-dischargeability argument under § 523(a)(4).  Even though FCS should be limited to one choice of law to apply based on a contractual choice of law provision, choosing which law to apply is inconsequential on this issue because New Jersey and Texas law is essentially identical.

3.   STATUS. . . . [I]t is expressly understood and agreed that Sub-Producer occupies a fiduciary relationship with Company and General Agent in relation to the conduct of its business.  However, Company is not the fiduciary of either General Agent or Sub-Producer.

. . .

5.   POWERS OF ATTORNEY. . . . Said bail bond Powers of Attorney shall be delivered to Sub-Producer in trust, and Sub-Producer shall act as trustee with regard to same, with Company being the beneficiary thereof.

. . .

7.   BOND COLLATERAL. . . . Company shall be named trustee on any build up fund/reserve account, indemnity account, client trust fund, or collateral account, and is the intended beneficiary thereof. . . . Company and/or General Agent may, at their discretion, direct Sub-Producer to deliver immediately any and all collateral of any sort taken by Sub-Producer at any time as bond security to Company and/or General Agent; the collateral shall be identified by bond number, indemnitor, and principal, to be held in trust by Company until released to Sub-Producer or directly to the party who gave such collateral, and Company shall be the beneficiary of same. Sub-Producer shall hold such collateral as a fiduciary in a manner, which complies with all laws and administrative regulations of the State . . . . In the event that Sub-Producer fails or refuses to provide the Company and/or General Agent with receipts and collateral for executed bonds, it shall be conclusively presumed in any litigation, lawsuit, or other proceeding between the Company and/or General Agent and Sub-Producer, or in which the Company has a beneficial interest in the claim, that: 1) Sub-Producer received collateral for the bond in the full face amount of the bond as trustee for Company; 2] such collateral is in the possession, custody, and control of Sub-Producer; and 3) Sub-Producer, as Company's fiduciary trustee, has failed to account for such collateral, and is fully liable for the taking, supplying, maintenance, and return thereof.

8.   BOND PREMIUM RATES, COLLECTION AND REMITTANCES. . . . (b) All bond premiums chargeable, charged, receivable, collected, and/or held by Sub-Producer shall belong solely to Company until actual receipt by Company of the amount to which Company/General Agent is entitled as described herein. Once Company and General Agent have been paid any amount due

to them in respect to bond premium, Sub-Producer shall retain
all remaining premiums collected or outstanding.

. . .

14.   RECORDS AND REPORTS OF SUB-PRODUCER. Sub-Producer
acknowledges and agrees that it is its fiduciary duty to the
Company to maintain all files and records concerning each and
every Company bond that has been executed by Sub-Producer
and/or its employees/independent contractors for a period of
five (5) years from the execution date of each bond.

(Docket No. 3-3 at 14-26.)

Based on the parties' agreement, Thayer agreed to act in a

fiduciary capacity to FCS in two ways.  First, he accepted the

powers of attorney granted to him by FCS that imposed a fiduciary

duty on Thayer to act for the FCS's benefit.  See In re Parks, No.

05-37154/JHW, 2007 WL 2033380, at *14 (Bankr. D.N.J. July 10,

2007) (citing D'Amato v. D'Amato, 701 A.2d 970, 973 (N.J. Super.

Ct. App. Div. 1997); Manna v. Pirozzi, 131 A.2d 55, 57 (N.J.

Super. Ct. App. Div. 1957) ("[W]hen a person undertakes to act as

an agent, he assures the obligations of a fiduciary.")); N.J.S.A.

46:2B-19 (under a power of attorney, agent serves as a fiduciary);

Jordan v. Lyles, 455 S.W.3d 785, 792 (Tex. App. 2015) ("A power of

attorney creates an agency relationship, which is a fiduciary

relationship as a matter of law.").  Second, Thayer agreed to

create an express trust for FCS's premiums, as defined in the

various provisions in the parties' agreement.

Thus, because Thayer "acted in a fiduciary capacity" in his

relationship with FCS, it must be determined whether the premium

35

debt is excepted from discharge under § 523(a)(4) "for fraud or defalcation."  As noted above, the bankruptcy court determined that Thayer's failure to provide FCS with its premium funds did not constitute defalcation because Thayer used the funds for his business expenses, and not for personal use.[19]  Even accepting the bankruptcy's assessment of Thayer's good intentions to keep his business afloat, Thayer's intentional decision to convert for his own use premium payments that he held in trust for FCS meets the definition of defalcation.

Additionally, even though the parties' agreement permitted

---

[19] The bankruptcy court interpreted Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013) to require that FCS must show that Thayer committed a gross deviation from the legal standards of conduct, and that Thayer's breach of his obligations to FCS – namely, his failure to pay FCS its premiums as required by the contract – did not constitute per se defalcation. (Docket No. 3-5 at 16.)  This Court disagrees with the bankruptcy court's application of Bullock to the facts of this case.  Bullock decided for the first time whether § 523(a)(4) had a scienter requirement, and if so, what standard applied.  In doing so, Bullock held that the definition of defalcation extends beyond intentional conduct to include conduct constituting a conscious disregard of a "substantial and unjustifiable risk" a duty would be breached.  The gross deviation analysis was simply designed to insure that the conduct was sufficiently reckless and not approaching mere negligence, a lower mens rea the Supreme Court implicitly rejected when it also rejected the "objectively reckless" standard in the Eleventh Circuit.  However, the Court's adoption of a willful blindness test, something short of intentional conduct, did not change the long standing law that the intentional breach of an express trust constitutes defalcation.  Where a fiduciary, acting pursuant to an express trust, intentionally breaches a known duty, as Thayer did, that "per se" conduct constitutes defalcation at its highest level, even if such conduct does not also constitute fraud, theft, or other acts evidencing moral turpitude. The Supreme Court's decision in Bullock did not change that.

FCS to "withdraw monies from the Indemnity Fund(s) [build-up fund] as Company deems necessary to reimburse itself for unpaid bail bond premiums," that provision did not absolve Thayer of his obligation to pay the premiums to FCS.[20]  (See Docket No. 3-3 at 19.)  A premium payment is money paid from a criminal defendant's friend or relative for the bond to be issued.  Even though Thayer was entitled to a percentage of the premium, the remainder of the premium belonged to FCS.  Moreover, the entire purpose of the build-up fund was to serve as security for Thayer's indemnifications of FCS, and it was separately funded by Thayer. (See id. ¶ 19, "As security for any and all indemnifications . . . Sub-Producer shall deliver to Company a cash sum equal to 1.0% of the total amount of bond liability for each bond written . . . . .")  This build-up fund constituted more than simply a premium savings account that Thayer could unilaterally tap into when he wanted to use the premiums held in trust for FCS for other

---

[20] The agreement provides:

> 21. PRESERVATION OF INDEMNITY FUNDS. Should Company make an Indemnity Fund(s) withdrawal for indemnification herein described, Company may, at its sole discretion, require Sub-Producer to reimburse said Indemnity Fund(s) in the amount withdrawn, either forthwith or in installments as determined by Company. Under extraordinary circumstances, Company may, at its sole discretion, at the request of General Agent or Sub-Producer, pay a forfeiture from the General Agent's or Sub-Producer's Indemnity Fund(s) at General Agent's or Sub-Producer's request, but shall have no obligation to do so.

(Docket No. 3-3 at 19.)

purposes.[21]

Thayer's use of premiums held in trust for FCS for other business expenses may not have been motivated by bad intentions, but his actions breached his fiduciary duties to FCS.  Because Thayer committed defalcation while acting in a fiduciary role, his debt for the unpaid premiums and unreturned powers of attorney must be exempted from discharge pursuant to § 523(a)(4).

**C.   Whether FCS is entitled to attorneys' fees and other costs associated with the bail bond forfeiture judgment, the default judgment, and the bankruptcy proceedings**

FCS argues that it is entitled to its attorneys' fees and costs associated with Thayer's nondischargeable debts.  The bankruptcy court denied FCS's request for fees and costs because it found that Thayer's debts were dischargeable.  Thus, this Court must determine whether FCS is entitled to its attorneys' fees and costs now that Thayer's debts have been found to be exempted from discharge.

With regard to the bail bond forfeiture judgment, FCS's attorneys' fees and costs do not amount to a "forfeiture payable to and for the benefit of a governmental unit."  11 U.S.C. § 523(a)(7).  Moreover, § 523(a)(7) does not apply to "compensation for actual pecuniary loss," which FCS's expenses relating to the

---

[21] FCS argues that Thayer failed to fully fund the build-up account, although Thayer believed it was fully funded.  Whether the build-up fund was fully funded or not is immaterial to the analysis of nondischargeability under § 523(a)(4).

default judgment and the payment of the forfeiture judgment can be considered.  Consequently, FCS is not entitled to attorneys' fees and costs relating to Thayer's debt not exempted from discharge under § 523(a)(7).

In contrast, however, attorneys' fees and costs incurred in connection with a debt deemed to be nondischargeable under 11 U.S.C. § 523(a)(4) are recoverable.[22]  In In re Grigg, 619 F. App'x 195, 199 (3d Cir. 2015), the Third Circuit affirmed the bankruptcy court's determination that Grigg's debt was nondischargeable under § 523(a)(4) because Grigg acted in violation of his fiduciary capacity with the state of mind required by Bullock.  The Third Circuit also affirmed the bankruptcy court's determination that that ancillary obligations - court-ordered attorneys' fees and costs awarded in conjunction with the contempt proceeding, as well as sanctions and costs against Grigg - were nondischargeable because they were incurred in connection with a nondischargeable debt.  The Third Circuit agreed with the bankruptcy court's reasoning: "but for Grigg's conduct, Chaney would not have incurred attorneys' fees, and the sanctions and costs would not have been imposed.  The ancillary obligations are therefore, as

---

[22] Because the Court found that the forfeiture judgment was nondischargeable under § 523(a)(7), the Court did not need to decide the issue of whether the forfeiture judgment was nondischargeable under § 523(a)(4).  See, infra, note 14.  The Court will not undertake that analysis solely to determine if FCS would be entitled to attorneys' fees and costs.

the Bankruptcy Court explained, nondischargeable." In re Griggs, 619 F. App'x at 199.

In this case, FCS would not have incurred attorneys' fees and costs in the bankruptcy proceedings if Thayer had not attempted to discharge a nondischargeable debt caused by violating § 523(a)(4). Even though the circumstances in Griggs were more egregious than the case here,[23] FCS was required to oppose Thayer's request to reopen his bankruptcy to include the premium debt, and then file an adversary proceeding to recover that debt, all of which was incurred because Thayer's debt was garnered through defalcation while acting in a fiduciary capacity. Accordingly, FCS is entitled to its attorneys' fees and costs that are directly attributable to Thayer's debt that is exempted from discharge under § 523(a)(4).

**CONCLUSION**

A bail bondsman holds a unique position in the criminal justice system. Criminal defendants are released from jail pending further court proceedings under the supervision of the bail bondsman based on the agreement that the criminal defendant and the bail bondsman will both suffer financial consequences if

---

[23] Ronald Grigg was a lawyer who represented Blaine Chaney in a divorce. Grigg paid himself approximately $2.2 million in fees from his client trust account. Chaney eventually filed suit against Grigg, disputing his legal fees. Instead of returning the fees to the client trust account (as he was obligated to under California law), Grigg continued to spend the disputed funds. In re Griggs, 619 F. App'x at 199.

40

the criminal defendant fails to appear when he is supposed to. Permitting a bail bondsman to discharge in bankruptcy the financial consequences of his failure to assure the criminal defendant's appearance would seriously undermine the integrity and function of the bail bond system and the criminal justice system as a whole.

Relatedly, similar to the duty a bail bondsman has to the state to keep tabs on a criminal defendant who is out of custody on bail, a bail bondsman has a fiduciary duty to the surety that underwrites the bail bonds secured by the bondsman.  A bail bondsman cannot discharge in bankruptcy the unpaid premium payments he is required to hold in trust for the surety when he has used those funds for other purposes.  Consequently, the debt for bail bond forfeiture judgments, manifesting in any form, and the debt for unpaid premiums and other similar obligations to the surety are nondischargeable in bankruptcy.

Specifically relating to Thayer, a precise accounting must be performed to determine the total amount of Thayer's nondischargeable debt to FCS.  The amount of the nondischargeable debt is the amount of the bail bond forfeiture judgments ($165,000.00) and the premium debt ($11,299.30 in premium payments and $6,399.00 in unreported bail bond powers of attorney, totaling $17,698.30).  According to the bankruptcy court's calculation, that debt, however, has been reduced by several events.  FCS

41

applied Thayer's build-up fund to the outstanding forfeitures with three disbursements: $15,500, $32,584.14, and $.18.  FCS also received a fifty-two percent remission of Weston Smith's $150,000.00 bond and the New Jersey state court ordered the return of $78,000.00 to FCS.  Thus, it appears that of the $182,698.30 of nondischargeable debt, $126,084.32 has been paid to FCS, leaving $56,613.98 in debt that is exempted from discharge.  A more thorough accounting must be performed to set the precise nondischargeable debt Thayer owes to FCS.  The same specific itemization must be performed for the attorneys' fees and costs related to Thayer's nondischargeable debt under § 523(a)(4).  We leave such matters to the bankruptcy court upon remand.

     An appropriate Order will be entered.


Date:   September 30, 2016          s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.